**In re WALDEN RIDGE DEVELOPMENT, LLC, Debtor.**

No. 02–45411.

United States Bankruptcy Court, D. New Jersey.

April 28, 2003.

Yale I. Lazris, Mandelbaum, Salsburg, Gold, Lazris, Discenza & Steinberg, P.C., West Orange, NJ, for Nicholas Rizzo, t/a Edgewater Associates.

Timothy P. Neumann, Broege, Neumann, Fischer & Shaver, LLC, Manasquan, NJ, for Debtor.

## OPINION

DONALD H. STECKROTH,
Bankruptcy Judge.

These matters are before the court upon (1) the motion by Nicholas Rizzo to dismiss the Chapter 11 as a bad faith filing pursuant to 11 U.S.C. § 1112(b) or, alternatively, to vacate the automatic stay under 11 U.S.C. § 362(d), which the Debtor has opposed, and (2) the Debtor's motion to (A) assume an option agreement and (B) assume and assign a contract for the purchase of real property, which is opposed by Nicholas Rizzo. For the reasons that follow, the motion to dismiss and vacate the stay is DENIED and the motion to allow assumption and assignment is GRANTED.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151 and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (G). Venue is proper under 28 U.S.C. § 1409(a). The following shall constitute the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

## STATEMENT OF FACTS

The Debtor, Walden Ridge Development, LLC ("Debtor"), filed its Chapter 11 petition on December 18, 2002 ("Petition Date"). The Debtor is an entity formed on August 3, 2002 for the purpose of acquiring and developing a specific parcel of real property known as the Walden Village, Hardyston Township, Sussex County, New Jersey consisting of 86.4 acres (the "Property"). At the time of its formation, the managing and sole member of the Debtor was Michael Quigley ("Quigley").

On August 23, 2002, the Debtor entered into a contract with Nicholas Rizzo, t/a Edgewater Associates ("Rizzo" or "Movant") for the purchase of the Property ("Purchase Contract"). The purchase price set forth in the contract is $7,170,500. A deposit of $100,000 was paid and is being held by the attorneys for Rizzo. Between the date of the Purchase Contract and the Petition Date, the Debtor incurred unsecured debts totaling $351,700 in connection with the real estate project. As of the Petition Date, all government approvals had finally been obtained to build 287 townhouses on the Property and building permits are available.

The closing date was extended four times due to the failure of the parties to satisfy contingencies within the time parameters originally contemplated. Although the Purchase Contract was not contingent on the Debtor obtaining financing, the Debtor asserts the seller's delay in obtaining the governmental approvals affected the Debtor's efforts to obtain financing necessary for closing. By letter dated December 13, 2002, Rizzo advised that due diligence had ended and made closing time of the essence, setting a closing date of December 19, 2002. The Debtor requested additional time, which was denied. The Debtor was not able to obtain the necessary financing in that time period and filed for Chapter 11 bankruptcy protection on December 18, 2002, the day before the closing date.

Quigley is blunt in acknowledging he did not want to be a member of an entity which filed a bankruptcy petition. As a result, on December 16, 2002, Quigley re-

signed as managing member and assigned his membership interest to William Govel ("Govel"). Also on that day, the Debtor entered into an option agreement ("Option") with Pottersville Properties, LLC ("PPL"), an entity owned entirely by Quigley. Under the terms of the Option, PPL paid $10,000 to the Debtor in consideration for the Option to acquire the Purchase Contract from the Debtor for a payment of $820,000. The $830,000 to be realized will enable the Debtor to pay its unsecured creditors 100% of their scheduled claims.[1] Quigley certifies that the reason for the Option to PPL was due to his belief that the Chapter 11 filing would hamper Debtor's ability to obtain financing, a burden PPL would not have.

At the time the motion to dismiss was heard, PPL had obtained a loan commitment from First Savings Bank ("FSB") which provides $5,000,000 for land acquisition. Quigley certifies he has more than $2,000,000 of his own marketable securities available for liquidation. PPL has also obtained equity investors who will provide sufficient funds to pay the balance due Rizzo and enable the Debtor to propose a plan which will immediately pay its creditors 100% of their claims. PPL asserted it would exercise the Option and file a Plan of Reorganization paying creditors in full. The proposed plan was filed February 26, 2003.

An appraisal of the Property offered by Debtor indicates a fair market value in excess of $8,000,000. Rizzo presented no evidence contradicting the appraisal. Since the Purchase Contract with Rizzo is for $7,170,500, the substantial equity in the Property adequately protects the interest of Rizzo despite his assertion of prejudice due to his fear of the uncertainty of the economy and the real estate market.

After the hearing on the motion to dismiss, the Debtor filed its motion for assumption of the Option and assumption and assignment of the Purchase Contract. That motion was argued and the parties submitted briefs after the hearing on issues first raised by Rizzo at the time of argument. The last brief was filed on April 3, 2003 and the record closed at that time. This opinion follows.

## LEGAL ANALYSIS

### 1. Motion to Dismiss and/or Vacate Automatic Stay

Rizzo has moved seeking an order dismissing the Chapter 11 proceeding pursuant to 11 U.S.C. § 1112(b), contending it was filed in bad faith, and lifting the automatic stay imposed by § 362 of the Bankruptcy Code. 11 U.S.C. § 362(a).

11 U.S.C. § 1112(b) permits a court, in its discretion, to convert or dismiss a Chapter 11 petition on the request of a party in interest. It provides in part:

> ... the court may convert a case under this chapter [Chapter 11] to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is the best interest of creditors and the estate, for cause ...

■ In addition to the court's discretion to dismiss a Chapter 11 case for "cause," the court may also dismiss a case for the ten reasons enumerated in the statute. 11 U.S.C. § 1112(b)(1)–(10). The list is not exhaustive and courts should "consider other factors as they arise." *First Jersey National Bank v. Brown (In re Brown)*, 951 F.2d 564, 572 (3rd Cir.1991).

■ A debtor's lack of good faith constitutes cause for dismissal of a Chapter 11

---

**1.** The terms of the Option were subsequently amended, but 100% payment to creditors would still be immediately available to be paid.

petition. *In re SGL Carbon Corp.*, 200 F.3d 154, 160–62 (3rd Cir.1999); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988). It is well established that a debtor's bad faith filing of a bankruptcy petition is sufficient "cause" to warrant dismissal of a case under § 1112(b). *In re Ravick Corp.*, 106 B.R. 834, 842 (Bankr. D.N.J.1989). *See also Matter of Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444 (Bankr.D.N.J.1993) (lack of good faith is sufficient "cause" for dismissal or conversion of Chapter 11 case.) The movant has the initial burden to present a *prima facie* case alleging bad faith; once achieved, the burden shifts to the debtor to prove that the petition was filed in good faith. *Matter of Century City, Inc.*, 8 B.R. 25 (Bankr.D.N.J.1980); *Matter of Dunes Casino Hotel*, 63 B.R. 939 (D.N.J.1986).

The reason for imposing a good faith requirement was stated by the Third Circuit as follows:

> It is easy to see why courts have required Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose. Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors. When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code. *In re SGL Carbon Corp.*, 200 F.3d at 165–66. *See also First Jersey Nat'l Bank v. Brown*, 127 B.R. 108, 112 (D.N.J.1991), *rev'd* on other grounds.

A determination of a debtor's motive for filing centers upon the totality of the circumstances. *In re SGL Carbon Corp.*, 200 F.3d at 165; *Matter of Newark Airport/Hotel Ltd. Partnership*, 156 B.R. at 448; *In re Central Jersey Airport Services, LLC*, 282 B.R. 176 (Bankr.D.N.J. 2002). The existence of bad faith depends not on the presence of any one specific factor but upon a combination of factors, after careful examination of all the facts of a debtor's case. *Matter of Taylor*, 103 B.R. 511, 521 (D.N.J.1989).

Courts have dismissed cases as bad faith filings for a variety of reasons, including but not limited to: (1) when the petition is filed merely as a litigation tactic; (2) when the petition was filed solely to frustrate the legitimate efforts of other parties to enforce their rights; (3) when the debtor lacks a valid reorganizational purpose; and (4) when the debtor's sole motive is to avoid a contract. *See In re SGL Carbon Corp.; In re Ravick Corp.; See also In re Y.J. Sons & Co., Inc.*, 212 B.R. 793 (D.N.J.1997); *In re HBA East, Inc.*, 87 B.R. 248 (Bankr.E.D.N.Y.1988); *In re Heritage Wood 'N Lake Estates, Inc.*, 73 B.R. 511, 514 (Bankr.M.D.Fla. 1987). However, Chapter 11 filings arising out of a two-party dispute or triggered by state court proceedings do not *per se* constitute bad faith filings. *In re Ravick*, 106 B.R. at 850; *In re SGL Carbon*, 200 F.3d at 162, n. 11; *Matter of Newark Airport/Hotel Ltd.*, 156 B.R. at 449.

Significantly, dismissals of Chapter 11 cases caused by a debtor's bad faith routinely show elements of prejudice to one or more creditor classes. Rizzo argues here that he is being prejudiced due to the uncertainty of the economy and the real estate market, conditions always present. Debtor counters by stating it is simply attempting to close title and take advantage of that market since the Property has substantially increased in value. Rizzo also argues that the Debtor has no real property, personal property, secured creditors or unsecured priority creditors; how-

ever, the Debtor holds a valuable Purchase Contract and does schedule 13 creditors holding general unsecured claims totaling $351,700. Rizzo asserts that the Debtor never had a bank account, never issued checks and except for signing the contract, never functioned. He argues that the Debtor was never in business and does not intend to stay in business since all of its rights have been assigned. Thus, he argues that there is nothing to protect or reorganize.

On the Petition Date, the Debtor still had the opportunity to perform the contract. Under ordinary circumstances, the contract is subject to assumption or rejection under 11 U.S.C. § 365. *See In re ERA Central Regional Services, Inc.,* 39 B.R. 738, 740–41 (Bankr.C.D.Ill.1984) ("Where a franchisee is granted time to cure defaults and the franchisee files its bankruptcy petition prior to the time the cure period expires, the franchise agreement is not terminated and is property of the estate."); *Matter of Independent Management Associates, Inc.,* 108 B.R. 456 (Bankr.D.N.J.1989).

Rizzo relies heavily upon *In re Laguna Associates, Ltd. Partnership,* 30 F.3d 734 (6th Cir.1994) as authority that the Debtor's petition was filed in bad faith. *Laguna* is a classic "new debtor syndrome" case in which a one-asset entity is created on the eve of foreclosure to isolate the insolvent property and its creditors from other assets held by the original debtor which helped form the basis of the lender-borrower relationship. That is different from the facts before the Court.

In *Laguna,* the debtor had acquired the property in issue (its sole asset) one day before filing its Chapter 11. The mortgage secured by the property expressly prohibited transfer of the property unless certain conditions had been met. Despite this prohibition, the property was trans-

ferred to the debtor who immediately filed its Chapter 11 and sought bankruptcy protection and the automatic stay against foreclosure. The facts in the instant matter are clearly distinguishable from those in *Laguna.* The Debtor here was not created immediately prior to the filing for the specific purpose of acquiring title and seeking bankruptcy protection. The Debtor holds the Purchase Contract as its primary asset which, by its terms, permits assignment to an entity provided Quigley is principal. Such an assignment clause in real estate contracts is routine and evidence an understanding of the parties that the property in issue may well be taken by an entity other than the contract purchaser. This is exactly the intent of the Option and the proposal to assume and assign the Purchase Contract to PPL, an entity controlled by Quigley. Thus, Rizzo cannot be heard to complain that the assignment violates his Purchase Contract, a significant distinction from the mortgagee in *Laguna.* Moreover, even the *Laguna* court acknowledged one of the governing principles embodied within Chapter 11 when the court observed Chapter 11 was an "opportunity to protect (the debtor's) assets for a period of time so that the resources might be marshalled to satisfy outstanding obligations." *In re Laguna,* 30 F.3d at 737. The opportunity for a brief breathing spell, in order to obtain financing necessary for the closing on the Purchase Contract, is an acceptable and good-faith reason for the filing of this Chapter 11 with the eventual result of full payment to Rizzo and all creditors. In the absence of prejudice to Rizzo, the mere filing of this Chapter 11 petition does not evidence bad faith sufficient to warrant or justify dismissal.

In addition, the Court finds that the Debtor operates a legitimate business, the business of acquiring and developing a specific parcel of real property. Single-

asset entities are routinely utilized for real estate acquisition and development. Anything different would be an unusual business practice. Admittedly, the business of the Debtor has now changed, but by the filing it sought to preserve the value of the Property for the benefit of its creditors and Rizzo. The Debtor was forced to modify its business plan as a result of the inability to obtain timely financing, but it still has a business—to sell and assign its contract for a profit and utilize that profit to fund a plan of reorganization which will satisfy its creditors without prejudice to Rizzo.

■ Significantly, the Debtor does have creditors, the amended schedules indicate the existence of general unsecured claims of over $350,000. Of this sum, the claims of Michael Quigley and his law firm Castano Quigley LLC are insider claims. 11 U.S.C. § 101(31). Nevertheless, the balance of the claims totaling almost $190,000 are held by non-insider creditors who provided services in connection with the development of the Property and even the claims of insiders are considered in evaluating good faith since they remain a liability of the Debtor. *In re Central Jersey Airport Services, LLC*, 282 B.R. 176, 180 (Bankr.D.N.J.2002) ("Whether the $874,000 in unsecured debt is owed to the debtor's affiliates and managing members is irrelevant, as it is still indebtedness for which the debtor is liable.")

■ Finally, even if the Debtor had no ongoing business, the lack of an ongoing business is irrelevant for purposes of evaluating eligibility for Chapter 11 relief. *See Toibb v. Radloff*, 501 U.S. 157, 111 S.Ct. 2197, 2199, 115 L.Ed.2d 145 (1991); *In re Brown*, 951 F.2d 564, 567 (3rd Cir. 1991).

■ In summary, the test to be applied by this Court relative to a motion to dis-

miss is an examination of the totality of the circumstances, not rigid application of specific factors. Here, the Court can find no prejudice to Rizzo nor sufficient circumstances to determine this Petition was filed in bad faith. It is undisputed that the Debtor's motive in filing Chapter 11 was to preserve its Purchase Contract. The preservation of value is a permissible motive for filing Chapter 11 and the good faith requirement must be viewed in context with Congress' intent to promote reorganization. Thus, the filing was an appropriate exercise of business judgment and protected the equity of the Debtor in the Purchase Contract for the benefit of other creditors, as well as the Debtor.

■ The application to vacate the automatic stay must also be denied. The automatic stay, of course, comes into effect upon filing of the petition. 11 U.S.C. § 362(a). Presumably, Rizzo moves under § 362(d) for relief from the stay. Section 362(d)(1) provides for relief from the stay for cause, including lack of adequate protection of an interest in property. Here, the Court has determined that cause, or more appropriately Debtor's lack of good faith in filing the petition, has not been demonstrated or evidenced by the facts in the instant matter. In addition, the appraisal of the Property showing a fair market value in excess of $8,000,000, which is not contested by Rizzo, evidences substantial adequate protection of Rizzo's interest in the Property. Accordingly, relief is not appropriate under § 362(d)(1) and is denied.

Section 362(d)(2) provides for relief from the stay if (A) the debtor does not have equity in such property; and (B) such property is not necessary to an effective reorganization. 11 U.S.C. § 362(d)(2)(A) and (B). Section 362(g)(1) states that the movant requesting relief from the automatic stay has the burden of proof on the

issue of the debtor's equity in the property. 11 U.S.C. § 362(g)(1). Here, the only proof relative to equity is Debtor's appraisal showing almost $1,000,000 in equity and thus Rizzo has not met his burden under § 362(g)(1). It is clear from the facts before the Court that Debtor does have equity in the Property and thus the motion to vacate the stay under § 362(d)(2) is denied.

### 2. *Motion to (A) Assume Option Agreement and (B) Assume and Assign Contract for the Purchase of Real Property*

■ The Debtor's motion seeks (1) to assume the Option with PPL and (2) to assume and assign the Purchase Contract to PPL. The moving papers indicate that by agreement dated February 28, 2003, and subject to approval of the Bankruptcy Court, the Debtor and PPL modified the payment terms of the Option and that by agreement of the same date, PPL exercised the Option, subject to approval by the Bankruptcy Court authorizing the Debtor to assume and assign the Purchase Contract to PPL. A certification in support of the motion indicates the financing contingency had been satisfied, the sums due under the Purchase Contract with Rizzo were available, and creditors would be paid 100% of their claims.

The assumption and assignment motion was opposed by Rizzo who essentially relied upon his pleadings previously filed on the dismissal motion. Rizzo argues against the assumption and assignment contending that, as a result of the Option, Debtor would be left with no assets to reorganize. In addition, he argues that the alleged payoff to him of $7,070,500 lacks interest and taxes he is owed and that, due to the delay since the filing of the Petition, his position has been compromised.

At the hearing, Rizzo for the first time argued that § 108(b) of the Bankruptcy Code granted the Debtor 60 days beyond the Petition Date to cure the default under the Purchase Contract caused by Debtor's failure to close under the time-of-the-essence notice setting December 19, 2002 as the date of closing. *See* 11 U.S.C. § 108(b). Rizzo argues that the additional 60–day period expired on February 18, 2003, weeks before the Debtor filed the instant Motion to Assume the Option and Assume and Assign the Purchase Contract; and thus, since the Debtor did not perform, or even move to assume within the 60–day period, the Purchase Contract has terminated as a matter of law. Rizzo relies upon *In re New Breed Realty Enterprises, Inc.,* 278 B.R. 314 (Bankr.E.D.N.Y. 2002), for his position that a debtor's failure to close a sale on or before a time-of-the-essence closing date, including any extension provided by § 108(b)'s statutory 60–day period, constitutes a non-monetary default which cannot be otherwise cured. *Id.* at 320. *See also In re Claremont Acquisition Corp., Inc.,* 113 F.3d 1029, 1033 (9th Cir.1997).

The Purchase Contract between the Debtor and Rizzo is an executory contract governed by the provisions of § 365 of the Bankruptcy Code. 11 U.S.C. § 365. In a Chapter 11 proceeding, the trustee or debtor-in-possession may assume or reject an executory contract at any time before the confirmation of a plan subject only to the condition that the court may, on the request of a party to such contract, order the debtor to determine within a specified period of time whether to assume or reject such contract. 11 U.S.C. § 365(d)(2).

Section 365(f)(2) provides for the assignment of an executory contract if (A) the contract is assumed in accordance with § 365 and (B) adequate assurance of future performance by the assignee of such contract is provided, whether or not there

has been a default in such contract. 11 U.S.C. § 365(f)(2)(A) and (B).

11 U.S.C. § 108(b), relied upon by Rizzo, states:

> (b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—
>
> > (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> >
> > (2) 60 days after the order for relief.

The majority of courts have determined that the 60–day limitation on cure periods provided in § 108(b) does not alter the specific provisions of § 365. It has long been recognized that "Section 108(b) does not apply to curing defaults in executory contracts. Section 365 specifically governs the time for curing defaults in executory contracts, and thus, it controls . . ." *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1215 (7th Cir.1984), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984).

The courts in this district have followed *Moody*. *See Matter of Dunes Casino Hotel*, 63 B.R. 939, 949 (D.N.J.1986) and *In re Tudor Motor Lodge Associates, Ltd. Partnership*, 102 B.R. 936, 951 n. 8 (Bankr. D.N.J.1989) where Chief Judge Gambardella stated:

> "The court here notes that to the extent there is a conflict between the specific sections of §§ 362, 365 and 105, and the general provision of § 108 (which provides for a 60–day limitation on cure periods), the specific provisions prevail. 'Section 108(b) does not apply to curing defaults in executory contracts. Section 365 specifically governs the time for curing defaults in executory contracts, and thus, it controls here.' *Moody v. Amoco Oil Co.*, *supra*, 734 F.2d at 1215 (citation omitted)."

Other courts have consistently recognized that the specific assumption and assignment provisions of § 365 prevail over the general provisions of § 108. *See In re Round Hill Travel, Inc.*, 52 B.R. 807, 808 (Bankr.D.Nev.1985)("Those courts which have directly addressed the relationship between § 108(b) and § 365 have concluded that § 365 governs the debtor's right to assume executory contracts and hence the time for cure of defaults."); *In re Henke*, 84 B.R. 693, 697 (Bankr.D.Mont.1988)("I hold further that in an executory contract situation, § 365, not 108(b), applies . . ."); *In re ERA Central Regional Services, Inc.*, 39 B.R. 738, 741 (Bankr.C.D.Ill. 1984)("The court concludes that the specific provisions of § 362 and § 365, buttressed by § 105, prevail, to the extent there is conflict, over the general § 108 provision."); *In re Masterworks, Inc.*, 100 B.R. 149 (Bankr.D.Conn.1989). (Section 365 gives the debtor a right to cure any time before confirmation). Certainly, most agree that just about any default can be cured so long as the other party is compensated for economic loss. *See* 3 Collier on Bankruptcy (15th ed. rev.), ¶ 365.05(3)(b) and (c).

██ If an exception exists, it appears to arise from the notion that certain "historical facts" constitute non-monetary defaults which cannot be cured (such as anticlosure provisions in automobile franchise agreements) and thus are limited to the 60–day extension provision in § 108(b). This concept gained recognition through *In re Claremont Acquisition Corp., Inc.*, 113 F.3d 1029 (9th Cir.1997) and forms the

basis for the Bankruptcy Court's decision in *New Breed.* This Court finds the "historical fact" exception limited, at best, to franchise cases and certain other non-monetary defaults not easily cured but inapplicable to Debtor's failure to pay the purchase price and close under the time-of-the-essence letter in the instant matter.[2] This Court does not follow the lead of *New Breed* in characterizing the failure of a buyer to pay the purchase price under an executory contract as a non-monetary default. Such default simply does not equate to the "historical fact" default in the automobile franchise cases which may be characterized as non-monetary. Here, the failure to close was occasioned by the failure to pay the purchase price and thus constitutes a monetary default which is curable through the payment of the purchase price together with fair compensation as provided in § 365(b)(1)(A) and (B). To the extent *New Breed* holds differently, it is not followed. Moreover, where the default is non-monetary the debtor may be precluded from assuming an executory contract only if the default is material or if the default causes substantial economic detriment. *In re Joshua Slocum, Ltd.*, 922 F.2d 1081, 1092 (3rd Cir.1990). In *Joshua Slocum,* the Third Circuit addressed the standard to be applied in determining whether the existence of a non-monetary default precluded assumption of an unexpired non-residential lease. The court approved the concept that "[t]he (bankruptcy) court does retain some discretion in determining that lease provisions ... may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets." (citations omitted) *Id.* at 1092.

Here, unlike *New Breed* where the debtor conceded that seller suffered economic harm as a result of debtor's default, there is no substantial economic detriment to Rizzo if closing occurs. Upon assumption and assignment, Rizzo will be paid in full together with all interest and advances allowed under the Purchase Contract. Rizzo will have obtained the benefit of his bargain while, at the same time, the assumption and assignment allows the bankruptcy estate to realize the value of this asset. Realization of that value allows for the creditors to be paid in full and the Debtor or its assignee to obtain the net profit from the transaction, the benefit of its bargain. To rule otherwise would be to allow a windfall to Rizzo, to the detriment of creditors and the Debtor.[3] The Debtor herein was not limited by § 108(b) to assume and assign the Purchase Contract within 60 days of the Petition being filed. I find that the Debtor's Motion to Assume and Assign was timely filed, is properly before the Court, and should be granted.

The closing shall occur within 30 days of the entry of the Order granting the motion. The parties are directed to cooperate in effectuating the closing. Rizzo is entitled to full payment under the terms of the Purchase Contract, at the time of closing. The parties are urged to discuss and come to agreement on the amount due to

---

2. Other courts have also limited or failed to follow the holding in *Claremont. See In re Vitanza,* 1998 WL 808629 (Bankr.E.D.Pa. 1998); *In re Bankvest Capital Corp.,* 270 B.R. 541 (Bankr.D.Mass.2001). In addition, legal commentators have expressed strong criticism of *Claremont.* James I. Stang, *Assumption of Contracts and Leases: The Obstacle of the Historical Default,* 24 Cal. Bankr.J. 39 (1998); William P. Weintraub, Esq., *Historical Defaults and Cross–Defaults: Here a Default, There a Default, Everywhere a Default, Default, Default,* 26 Cal. Bankr.J. 286 (2003).

3. Rizzo has indicated he would satisfy general creditors but takes exception to the debts owed to insiders and thus has not agreed to pay all of Debtor's general creditors.

Rizzo. In the event agreement cannot be reached, sufficient funds are to be escrowed at closing to satisfy payment to Rizzo and the Debtor shall immediately file an application with the Court to fix the amount due under the Purchase Contract. If such application is necessary or an application must be brought because of the failure of a party to cooperate and act in a reasonable manner, the prevailing party shall receive an award of attorney's fees and costs. The parties are urged to act reasonably.

For the reasons set forth above, Rizzo's motion is denied and Debtor's motion is granted. The attached Orders have been entered by the Court.